UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STEPHANIE GARZA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>ANTONY BLINKEN, )<br>*Secretary of United States Department of State*, )<br>)<br>Defendant. )<br>) | Civil No. 21-cv-02770 (APM) |

**MEMORANDUM OPINION**

I.     **INTRODUCTION**

Plaintiff Stephanie Garza has worked as a human resource specialist for the U.S. State Department since 2010, including postings in Austria, Pakistan, Russia, Venezuela, Mexico, and Haiti. Beginning in 2019, while stationed in Mexico City, Plaintiff was subjected to unwelcome comments from her supervisor, Thomas Favret. When Plaintiff reported Favret's conduct to John Creamer, Favret's direct supervisor, he ignored her concerns. Plaintiff eventually filed an Equal Employment Opportunity ("EEO") complaint against Creamer, alleging that he "demonstrated reprisal" after she reported Favret's "inappropriate conduct."

Plaintiff brings the instant action against Defendant Secretary of State Antony Blinken in his official capacity, alleging sex discrimination, retaliation, and a hostile work environment based on sex in violation of Title VII of the Civil Rights Act of 1964. Before the court is Defendant's motion to dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be

granted.  Def.'s Mot. to Dismiss, ECF No. 9 [hereinafter Def.'s Mot.].  For the following reasons, Defendant's Motion to Dismiss is granted.[1]

## II.  BACKGROUND

In September 2019, Plaintiff Garza was a human resource specialist posted at the U.S. Embassy in Mexico City ("Embassy Mexico").  Compl. ¶¶ 7–8.  Her direct supervisor was Marco Sims, the management counselor in Embassy Mexico, and her second line supervisor was Favret, the minister counselor for management affairs.  *Id.* ¶ 8.

Favret's alleged inappropriate behavior began around October 4, 2019.  *Id.* ¶ 9.  He "frequently called Garza into his office for unscheduled meetings, often to discuss topics unrelated to work" and "would stare at her breasts during these meetings."  *Id.* ¶ 10.  He made comments to Garza regarding the number of women working at Embassy Mexico, stating that there were "too many women" in the workplace because "human resources discriminated against men."  *Id.* ¶ 9.  He told Garza that "he had historically given [women] good reviews" and "ha[d] to support women even if they take some of the jobs [he] want[s]," and that "his wife was a feminist and expressed frustration with him at times."  *Id.*  In early November 2019, Favret greeted Garza with "hi beauty" and interrupted a meeting to say "oh, should I leave until after the spanking?"  *Id.* ¶¶ 13–14.  Favret made several inappropriate comments to other Embassy Mexico employees, who reported them to Garza.  *Id.* ¶¶ 12, 22–24.

Around November 7, 2019, Plaintiff first reported Favret's behavior to his supervisor, Creamer.  *Id.* ¶ 15.  In response, Creamer "scolded Garza."  *Id.* ¶ 16.  He told Garza that he "was busy," she was "creating more work for him," Favret was her "problem," and her "reports of

---

[1] Plaintiff recently filed a motion seeking leave to amend her complaint.  *See* Pl.'s Mot. for Leave to File First Am. Compl., ECF No. 20.  As that motion is not yet ripe for consideration, the court deems it appropriate to rule on the pending motion to dismiss.

2

sexually inappropriate comments . . . were nonsensical." *Id.* "Garza informed Creamer that she would be filing a complaint[2] of discrimination with [the State Department's EEO] office." *Id.* That same day, Plaintiff was transferred to Embassy Nassau for 30 days. *Id.* ¶ 16. Plaintiff does not explain why she was transferred. On November 19, 2019,[3] while Plaintiff was in Embassy Nassau, the Office of Conduct Suitability and Discipline contacted her to discuss Favret. *Id.* ¶ 17. "Garza requested that Creamer counsel Favret, however, unbeknownst to Garza, Creamer had allegedly already counseled Favret but neglected to inform her." *Id.*

When Plaintiff returned to Embassy Mexico, "she immediately noticed that Creamer's behavior had changed towards her." *Id.* ¶ 18. In December 2019, Creamer attempted to exclude Plaintiff from a meeting. *Id.* ("When Creamer saw that Garza was with Sims for the meeting, Creamer stated to Sims, 'so Marco [Sims], it's just going to be you and me meeting, right?'"). In May 2020, during a meeting, "Creamer asked each attendee to give an update on their work, but when it was Garza's turn to speak, Creamer only asked a yes or no question and quickly moved on." *Id.* ¶ 19. The next month, Garza reported Creamer's behavior to Deborah Larson (acting director of the Bureau of Western Hemisphere Affairs) and Julie Chung (principal deputy assistant secretary), expressing "her frustration with Creamer's refusal to engage in any preventive or corrective measures to address and redress Favret's discriminatory behavior." *Id.* ¶ 21.

In the meantime, Favret's inappropriate behavior continued and, in Garza's view, reached an intolerable pitch. In February 2020, Favret rejected Garza's request to give female employees leave during Mexico's "day without women"—a day intended to bring attention to violence against

---

[2] Plaintiff's does not allege that she *actually* filed an EEO complaint against Favret after this interaction with Creamer. Plaintiff clarifies in her opposition that she "filed an EEO complaint against Favret in November 2019, however, an EEO counselor never followed up with Plaintiff" and she "never received a report of investigation or [Final Agency Decision]." Pl.'s Opp'n to Def.'s Mot., ECF No. 12 [hereinafter Pl.'s Opp'n], at 21 n1.

[3] Plaintiff's complaint states that this occurred in November 2021. Compl. ¶ 17. However, the record shows that the investigation into Favret concluded in September 2020 and Favret left the State Department in October 2020. Thus, the court assumes this incident occurred before October 2020, in November 2019.

3

women in Mexico—because "doing so would be discriminatory against men." *Id.* ¶ 20. In June 2020: (i) "Favret belittled diversity and inclusion during a meeting, making a joke about 'beard discrimination,'" *id.* ¶ 22; (ii) "Garza received an email from an Entry Level Officer ("ELO") concerning a talk that Favret had given that the ELO found offensive to women, people of color, and the LGBT community" and "diminished the Black Lives Matter movement," *id.* ¶ 23; and (iii) a different ELO told Garza that Favret "made a homophobic comment" and declared that "women in the workplace are just like Black Lives Matter, you don't really notice it until it's brought to your attention," *id.* ¶ 24. On or about June 23, 2020, Garza reported "Favret's continuing discriminatory behavior" to Ambassador Christopher Landau, Larson, Chung, and Creamer. *Id.* ¶ 25.

Around June 25, 2020, at Larson's request, Garza drafted a "curtailment order" that "would immediately curtail Favret from Embassy Mexico" and emailed it to Ambassador Landau and Creamer for review and approval. *Id.* ¶ 26. After receiving Garza's draft, Ambassador Landau and Creamer "determined it was a conflict of interest for Garza to draft the order due to Garza's active EEO complaint against Favret," and Creamer described Garza's draft order as "emotional." *Id.* ¶ 27. Five days later, Garza filed an EEO complaint against Creamer. *Id.* ¶ 29. She stated:

> I reported incidents of inappropriate conduct of a senior official to John Creamer. He demonstrated reprisal and created a chilling affect [sic] in the following ways: Raised his voice during the initial meeting. Told me that it was "my issue." Tried to prevent me from attending a meeting. Refused to speak with me about the EEO case against Tom Favret. Has still not submitted the involuntary curtailment cable for Tom Favret, he would not even clear on my draft which [Western Hemisphere Affairs]/EX asked me to draft.

Def.'s Mot., Ex. A, ECF No. 9-1 [hereinafter EEO Complaint], at 2.

On the same day that Plaintiff filed her EEO complaint against Creamer, Creamer's investigation into Favret uncovered "other discrimination complaints against Favret . . . from more

4

than one embassy." Compl. ¶ 28. On September 17, 2020, Ambassador Landau "instructed Creamer to ask Favret to voluntarily depart from his post in Mexico City." *Id.* ¶ 30. On October 2, 2020, Garza "submitted a request for curtailment . . . because her work environment had become intolerable due to the sequalae of her discrimination complaints against Favret and management's reluctance to confront [him]." *Id.* ¶ 31, ¶ 61 (describing it as "a voluntary curtailment to a less desirable post"). Four days later, Favret retired from the State Department. *Id.* ¶ 30. On April 28, 2021, "Garza attended [an] alternative dispute resolution related to her EEO complaint against Creamer, but it was unsuccessful." *Id.* ¶ 32.

On August 17, 2021, the State Department issued a proposed letter of reprimand related to an April 2019 incident during which Garza allegedly "improperly allowed a diplomatic security employee to telework after departing from Embassy Caracas." *Id.* ¶ 33. According to Garza, an investigation already had found the allegations to be unsubstantiated. *Id.* The next month, "Garza submitted a rebuttal to the proposed letter of reprimand." *Id.*

### III.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

In evaluating a Rule 12(b)(6) motion to dismiss, the court must accept a plaintiff's factual allegations as true and "construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Hettinga v. United States*,

677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)); Fed. R. Civ. P. 12(b)(6). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678, and "the court need not accept inferences [that] are unsupported by the facts set out in the complaint," *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). "If a Title VII plaintiff fails to plead 'sufficient factual matter' to state a discrimination claim that is 'plausible on its face,' then the district court should dismiss the case." *Chambers v. District of Columbia*, 35 F.4th 870, 878 (D.C. Cir. 2022) (en banc) (quoting *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015).

A court reviewing a motion to dismiss may consider "only the facts alleged in the complaint, any documents attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). Accordingly, the court may consider Plaintiff's EEO complaint because it is incorporated by reference in her Complaint. Compl. ¶ 29; *see Hill v. Bd. of Trustees of the Univ. of the D.C.*, 146 F. Supp. 3d 178, 184 (D.D.C. 2015).

IV.   DISCUSSION

Plaintiff brings claims alleging discrimination, retaliation, and hostile work environment in violation of Title VII of the Civil Rights Act. Title VII makes it "unlawful [for employers] . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "A separate section of the Act—its antiretaliation provision—prohibits an employer from 'discriminat[ing] against' an employee or job applicant

because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (quoting 42 U.S.C. § 2000e-3). Although not explicit in the text of Title VII, the Supreme Court has held that "hostile environment claims . . . [are] cognizable under Title VII" when the harassment is "severe or pervasive." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998). The court addresses each of Plaintiff's claims in turn.

### A.     Count I: Discrimination

*Pleading standard.*  The court first addresses what Plaintiff must plead to survive a motion to dismiss. Defendant contends that Plaintiff must establish a *prima facie* case of discrimination under the *McDonnell Douglas* burden-shifting framework, *see* Def.'s Mot. at 6–7; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), but that is not correct. The *McDonnell Douglas* framework is "an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002). The Supreme Court "has never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Id.* at 511. "Consequently, the ordinary rules for assessing the sufficiency of a complaint apply." *Id.*

"To make out a case for discrimination at the motion-to-dismiss stage, Plaintiff need only allege that [s]he (1) suffered an adverse employment action (2) because of [her] . . . sex." *Jianqing Wu v. Special Couns., Inc.*, 54 F. Supp. 3d 48, 52 (D.D.C. 2014); *see Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008) ("Under Title VII . . . the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's . . . sex.").

7

*Adverse Employment Action.*  In *Chambers v. District of Columbia*, the D.C. Circuit redefined what constitutes an "adverse employment action" for purposes of Title VII discrimination claims, overturning the "objectively tangible harm" requirement articulated in *Brown v. Brody*, 199 F.3d 446 (D.C. Cir. 1999).  *See Chambers*, 35 F.4th at 873.  Under the "objectively tangible harm" standard, a plaintiff who "suffers no diminution in pay or benefits[,] does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities." *Brown*, 199 F.3d at 457.  Sitting en banc, the Circuit in *Chambers* overturned *Brown*, finding that the objectively tangible harm requirement was "inconsistent with Title VII," had been "eroded" by "intervening Supreme Court authority," and was "a judicial gloss that lacks any textual support." *Chambers*, 35 F.4th at 872, 875.

*Chambers* addressed the same question presented in *Brown*:  "whether an employer that denies an employee's request for a job transfer because of her sex (or another protected characteristic) 'discriminate[s] against' the employee with respect to the 'terms, conditions, or privileges of employment.'"  *Id.* at 874 (quoting 42 U.S.C. § 2000e-2(a)(1)).  The Circuit explained "that an employer that transfers an employee or denies an employee's transfer request because of the employee's . . . sex . . . violates Title VII by discriminating against the employee with respect to the terms, conditions, or privileges of employment."  *Id.* at 872.  "Refusing an employee's request for a transfer while granting a similar request to a similarly situated employee is to treat the one employee worse than the other," and the refusal "deprives the employee of a job opportunity."  *Id.* at 874.  The Circuit clarified that "not everything that happens at the workplace affects an employee's 'terms, conditions, or privileges of employment.'"  *Id.*  For example, a "mere formality of a change in title" would not change the "terms, conditions or privileges of

8

employment," and thus would not constitute an adverse employment action. *Id.* On the other hand, "the transfer of an employee to a new role, unit, or location" is "undoubtedly" an adverse employment action. *Id.*

The majority rejected the dissent's contention that doing away with the objectively tangible harm requirement would "create an 'artificial distinction between transfers and everything else,'" and emphasized that it was simply "[a]pplying the statute as written to discriminatory job transfers." *Id.* at 857 (quoting Dissenting Op. at 901); *id.* at 882 (stating that the majority's interpretation was "consistent with [Title VII's] text to prohibit all discrimination in the *terms or conditions of employment*") (emphasis added).[4] "[D]etermining whether a challenged action relates to 'terms, conditions, or privileges of employment' is a purely objective inquiry, well within the competence of a court." *Id.* at 877.

In light of *Chambers*, Defendant asks this court to "exercise caution in relying on any decision from the recent past describing what constitutes an 'adverse action,'" and urges the court to "return to the text of the federal sector provision of Title VII to determine what events are actionable under the statute." Def.'s Reply at 2–3. For the reasons stated in *Bain v. Office of Attorney General*, the court declines the invitation. No. 21-cv-1751 (RDM), 2022 WL 17904236, at *21 (D.D.C. Dec. 23, 2022). "[*Chambers*] did not so much as hint that the private-sector and federal-sector discrimination provisions should no longer be construed alike. If anything, it affirmed the status quo." *Id.* "[M]oreover, *Chambers* also overruled *Brown*, which itself involved a federal-employee plaintiff. It stands to reason that a case abrogating and replacing a standard initially announced as an interpretation of Title VII's federal-sector provision should itself control

---

[4] *Chambers* stopped short of determining whether Title VII had a *de minimis harm* requirement, finding the resolution unnecessary because "the discriminatory denial of a job transfer request, which deprives an employee of an employment opportunity offered to a similarly situated colleague, easily surmounts [the *de minimis harm*] bar." *Chambers*, 35 F.4th at 875.

9

as to that provision." *Id.* The court therefore will follow the guidance of *Chambers*, rather than Defendant's preferred analytical approach.

Plaintiff argues that her "curtailment . . . as well as the letter of proposed reprimand" are adverse employment actions. Pl.'s Opp'n to Def.'s Mot., ECF No. 12 [hereinafter Pl.'s Opp'n], at 13. The court evaluates each under *Chambers*.

*Proposed Letter of Reprimand.* The State Department issued Plaintiff "a proposed letter of reprimand" on August 17, 2021, which "alleged that Garza improperly allowed a diplomatic security employee to telework after departing from Embassy Caracas." Compl. ¶ 33. Defendant argues that a proposed letter of reprimand does not constitute an adverse employment action because Garza does not allege that it was ever issued or resulted in any professional consequences. Def.'s Reply at 2. The court agrees. The complaint is devoid of *any* facts suggesting that the proposed letter affected the terms and conditions of Garza's employment. Garza asserts in a conclusory manner that "the letter of proposed reprimand had a material effect on the terms and conditions of her employment," but does not explain how. Pl.'s Opp'n at 16. She does not state that the proposed letter of reprimand resulted in an office transfer, a change in responsibilities, or *anything* to suggest that the terms and conditions of her employment were affected *at all*. Without additional factual allegations, the court cannot find that a *proposed* letter of reprimand constitutes an adverse action under *Chambers*.

*Voluntary Curtailment.* Plaintiff also maintains that her "voluntary curtailment to a less desirable post" constitutes an adverse employment action. Compl. ¶ 61. On October 2, 2020, Plaintiff "submitted a request for curtailment" due to the "damaged relationship between Garza and the front office" and the fact that "her work environment had become intolerable due to the sequalae of her discrimination complaints against Favret and management's reluctance" to address

her complaints. *Id.* ¶ 31. In her opposition brief, Plaintiff reframes her "voluntary curtailment" as akin to a constructive discharge. She contends that "she was constructively discharged because of her sex," and that "Favret's sex-based harassment directed at Garza and the embassy at large, coupled with Creamer's inaction created such intolerable working conditions that Garza was forced to curtail." Pl.'s Opp'n at 13–14.

Even accepting Plaintiff's recharacterization of her claim, Plaintiff fails to plead a constructive "curtailment." "[T]o establish constructive discharge, the plaintiff must make a further showing beyond that needed to establish a hostile work environment." *Carter v. Nelson*, No. 20-5111, 2021 WL 6139250, at *2 (D.C. Cir. Dec. 27, 2021) (alternation in original) (internal quotation marks omitted); *Green v. Brennan*, 578 U.S. 547, 559 (2016) ("[A] hostile-work-environment claim is a 'lesser included component' of the '*graver* claim of hostile-environment constructive discharge.'") (quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 149 (2004)). For the reasons stated in Section IV.C., Plaintiff's hostile work environment claim fails. Because pleading constructive discharge requires more, Plaintiff's constructive curtailment claim necessarily fails, as well.

B. **Count II: Retaliation**

The court turns now to Plaintiff's retaliation claim. There are "fundamental differences between the [Title VII] antidiscrimination and the antiretaliation provisions." *Chambers*, 35 F.4th at 876. "Unlike the antidiscrimination provision, the antiretaliation provision is not expressly limited to actions affecting the terms, conditions, or privileges of employment." *Id.* It "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *White*, 548 U.S. at 67. "An employee's decision to report discriminatory behavior cannot immunize that

employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* at 68.

To survive a motion to dismiss, Plaintiff must plausibly plead that "she suffered (i) a materially adverse action (ii) because [she] had brought or threatened to bring a discrimination claim." *Baloch*, 550 F.3d at 1198. An action is "materially adverse" when "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 67. (internal quotation marks omitted). The inquiry is an objective one, *id.* at 68–69, and *Chambers* did not change the "materially adverse" standard articulated in *White*. *See Chambers*, 35 F.4th at 876 ("Our conclusion about the meaning of the antidiscrimination provision, however, is fully consistent with [*White*] because there are fundamental differences between the antidiscrimination and the antiretaliation provisions.").

Plaintiff argues that "[t]he issuance of the proposed letter of reprimand, over two years after the alleged incident where [she] permitted an employee to telework, is a pretext for . . . retaliation." Pl.'s Opp'n at 16. The allegations had been found unsubstantiated, she contends, and her employer "reopened the investigation only after Plaintiff continuously engaged in protected activity." *Id.* "[T]he reasons for the letter of proposed reprimand are nonsensical," Plaintiff continues, and "the letter uses offensive commentary, calling Plaintiff 'arrogant' and 'insincere.'" *Id.* Defendant responds that the proposed letter of reprimand is not materially adverse because it was not actually issued and, even if it was, "it would not likely dissuade a reasonable worker from making or supporting a charge of discrimination." Def.'s Reply at 6. The court agrees with Plaintiff that the long delay between the alleged misconduct and the proposed reprimand is curious, but ultimately finds that a mere proposed reprimand, even in the retaliation context, is not an adverse action.

12

The D.C. Circuit's decision in *Baloch v. Kempthorne* is on point. Like Plaintiff here, the plaintiff in *Baloch* asserted a claim of retaliation. He argued that his supervisor's "*proposed* 2-day and 30-day suspensions were materially adverse actions that tarnished his reputation and caused emotional distress." 550 F.3d at 1199 (emphasis in original). The D.C. Circuit rejected this argument, explaining that "courts have been unwilling to find adverse actions where the suspension is not actually served." *Id.* *Baloch*, therefore, forecloses Plaintiff's retaliation claim based on the proposed reprimand.

To the extent Plaintiff alternatively asserts that her "constructive curtailment" is a qualifying adverse action, that contention also fails, as discussed below.

### C. Count III: Hostile Work Environment

Plaintiff claims that Favret and Creamer's conduct was "sufficiently severe or pervasive for a hostile work environment based on sex." Pl.'s Opp'n at 22. The court disagrees.

"The bar for demonstrating a hostile work environment is a high one." *Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 183 (D.D.C. 2016). "To prevail on such a claim, a plaintiff must show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Baloch*, 550 F.3d at 1201 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "Determining whether an actionable hostile environment claim exists requires an examination of all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 103 (2002).

Plaintiff's allegations against Favret do not amount to a hostile work environment. Most of the alleged "comments or actions directed at" Plaintiff do not "expressly focus[]" on her sex, *Baloch*, 550 F.3d at 1201, and are more appropriately characterized as "mere offensive utterance[s]," *Morgan*, 536 U.S. at 103. Favret made comments to Garza regarding "his wife, who was a feminist and expressed frustration with him at times," as well as his historical practice of giving women "good reviews" and "support[ing] women even if they take some of the jobs [he] want[s]." Compl. ¶ 9. He also complained about the number of women working in the State Department; questioned whether the agency "discriminated against men since there were 'too many women'" in the workplace, *id.*; and refused to give female employees leave during Mexico's "day without women" because it "would be discriminatory against men," *id.* ¶ 20. While this behavior may be considered "harsh, unfair and rude," it does not "rise to the level of a Title VII violation." *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 188 (D.D.C. 2012). Other allegations pertain to reports of Favret's behavior that Plaintiff received but did not experience. *See* Compl. ¶¶ 12, 22–24. "Conduct directed at others rather than at plaintiff . . . is less indicative of a hostile work environment." *Lester v. Natsios*, 290 F. Supp. 2d 11, 31 (D.D.C. 2003); *see Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1144 (7th Cir. 1997) ("[T]he impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff.").

To be sure, *some* of Favret's comments and actions are related to Garza's sex. *See* Compl. ¶ 10 (Favret "frequently called Garza into his office for unscheduled meetings, often to discuss topics unrelated to work" and "would stare at her breasts during these meetings"), ¶ 13 (said "hi beauty" to Garza), ¶ 14 (interrupted a meeting to say "oh, should I leave until after the spanking?"). But the last two of these allegations are no more than isolated comments that cannot support a hostile work environment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)

14

(holding that "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" are not sufficiently serious to create a hostile work environment); *Tomasello v. Rubin*, 167 F.3d 612, 620 n. 11 (D.C. Cir. 1999). And while Favret's alleged staring at Plaintiff's breasts is unquestionably discomforting and boorish behavior, Plaintiff does not actually say how "frequently" this occurred during her time at Embassy Mexico. Without more, the court cannot say Plaintiff has plausibly alleged a hostile environment claim based on Favret's collective comments and actions. *See Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002) ("Even a few isolated incidents of offensive conduct do not amount to actionable harassment.").

Adding Creamer's alleged conduct to the mix does not help Plaintiff's cause. Plaintiff claims that Creamer "scolded" her when she first reported Favret's behavior and said that "her reports of sexually inappropriate comments . . . were nonsensical." *Id.* ¶ 16. After her report, Creamer attempted to exclude Garza from a meeting and reduced her ability to participate in another meeting. *Id.* ¶¶ 18–19. When she drafted Favret's curtailment order, Creamer described the order as "emotional." *Id.* ¶ 27. Even if these episodes could be attributed to Plaintiff's sex— as opposed retaliatory animus—they are, at most, "ordinary tribulations of the workplace" that do not give rise to an actionable hostile work environment claim. *Faragher*, 524 U.S. at 788.[5]

## V.   CONCLUSION

For the stated reasons, Defendant's Motion to Dismiss, ECF No. 9, is granted.

Dated: February 27, 2023

Amit P. Mehta
United States District Judge

---

[5] Having dismissed Plaintiff's hostile work environment claim as insufficiently pleaded, the court need not resolve whether a portion of that claim is barred for failure to exhaust administrative remedies.